764 So.2d 729 (2000)
Anthony MUNIZ, Appellant,
v.
STATE of Florida, Appellee.
No. 2D99-2099.
District Court of Appeal of Florida, Second District.
June 30, 2000.
James Marion Moorman, Public Defender, and Bruno F. DeZayas, Assistant Public Defender, Bartow, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Patricia E. Davenport, Assistant Attorney General, Tampa, for Appellee.
ALTENBERND, Acting Chief Judge.
Anthony Muniz appeals his convictions for domestic violence battery[1] and kidnaping.[2] The kidnaping charge involved Mr. Muniz's five-week-old son. We affirm the conviction for domestic violence battery, but reverse the conviction for kidnaping. The kidnaping statute does not criminalize the confinement of a child under the age of thirteen by "a parent or a legal guardian." See § 787.01(1)(b), Fla. Stat. (1997). Although Mr. Muniz was not married to the child's mother at the time of this offense, he was the child's legal father and, thus, a "parent" of the alleged victim. At least in the absence of a court order depriving him of authority over the child, Mr. Muniz could not be convicted of kidnaping his own child. See Johnson v. State, 637 So.2d 3, 4 (Fla. 3d DCA 1994). Cf. State v. Badalich, 479 So.2d 197, 199 (Fla. 5th DCA 1985) (holding father of nonmarital child cannot be criminally liable for false imprisonment of child); Lafleur v. State, 661 So.2d 346, 348 (Fla. 3d DCA 1995) (holding father who takes child contrary to court order can be convicted of kidnaping his own child).
Mr. Muniz is the father of a nonmarital child born on September 28, 1998. The child bears Mr. Muniz's last name, and Mr. Muniz appears on the child's birth certificate as the father. See § 382.013(2)(c), Fla. Stat. (Supp.1998) (prohibiting name of father from appearing on birth certificate for child born out-of-wedlock unless both parents sign consenting affidavit). When the child was born, and at least until the incident in this case occurred, Mr. Muniz either lived with the child's mother and child, or spent considerable time at their home.
On October 26, 1998, Mr. Muniz and the child's mother were drinking at her home and got into an argument. Sometime between *730 2 and 3 a.m. on October 27, 1998, the argument escalated and Mr. Muniz battered the mother. She fled the home, leaving the baby behind. About thirty minutes later, the mother called 911 from a nearby pay phone. She told the operator about the fight and asked the police to help her remove Mr. Muniz from her house and retrieve her baby. It is not clear whether she explained to the police that Mr. Muniz was the child's father.
When two police officers arrived, they escorted the mother back to the home and knocked on the door. At this point, the baby was sleeping and Mr. Muniz had begun to doze off. Mr. Muniz was startled and became scared. He did not respond to the officers' knock. Eventually, the child's mother opened the door and the officers went inside. They confronted Mr. Muniz with flashlights in the darkened home as he held the baby in his arms. The two officers, who were concerned for the child's safety, immediately demanded Mr. Muniz hand over the child. When Mr. Muniz refused, one officer approached him. At this point, Mr. Muniz saw a razor he had previously left on the floor and picked it up. He warded off the officers by threatening himself and the baby with the razor.
The situation deteriorated quickly. More officers arrived, and Mr. Muniz, still holding the baby, retreated backwards to a bathroom. Over a period of three hours, six officers attempted to convince Mr. Muniz to release the child to them. They called a tactical response team that arrived and lined up outside the residence. Finally, a group of officers seized Mr. Muniz and safely removed the baby. As a result of this incident, the State charged Mr. Muniz with armed kidnaping and domestic violence battery.
At trial, Mr. Muniz did not dispute the domestic violence charge and expressed remorse for the battery. With respect to the kidnaping charge, however, he testified that he never intended to harm the baby, but was concerned the officers would harm the baby. At the conclusion of the trial, Mr. Muniz moved for a judgment of acquittal, arguing that he could not be convicted of kidnaping his own child. The trial court denied this motion, reasoning that the mother was the sole natural guardian of this nonmarital child pursuant to section 744.301(1), Florida Statutes (1997). The jury returned a verdict of guilty of battery and of the lesser included offense of kidnaping. The trial court sentenced Mr. Muniz to time served for the battery, and 51.45 months' imprisonment for kidnaping.
Section 744.301(1) provides, "The mother of a child born out of wedlock is the natural guardian of the child and is entitled to primary residential care and custody of the child unless a court of competent jurisdiction enters an order stating otherwise." Despite the statute, because it appears that Mr. Muniz voluntarily acknowledged his paternity of this child, we question whether he may have some claim to be a legal guardian of the child. See § 742.10(1), Fla. Stat. (1997) (providing voluntary acknowledgment of paternity creates rebuttable presumption of paternity).
We need not resolve the question of whether Mr. Muniz was a legal guardian of the child. Even if the mother was the guardian of this child, Mr. Muniz clearly was a "parent" of the child. See § 787.01(1)(b); Johnson, 637 So.2d 3. The kidnaping statute does not establish a special definition of "parent." Assuming that "parent" is not a plain and unambiguous concept, any interpretation of this statute must favor the defendant. See § 775.021(1), Fla. Stat. (1997). We must therefore interpret the statute to include as a "parent" of a child a man whose name appears as father upon the child's birth certificate and who has acknowledged paternity pursuant to the "Determination of Parentage" statute.[3]
*731 The State argues that Lafleur, 661 So.2d 346, controls this case. In Lafleur, the Third District affirmed a father's conviction for kidnaping his child when a court order gave custody to the mother and when the father held the child at gunpoint resulting in an eight-hour crisis. See Lafleur, 661 So.2d 346. We recognize that the Lafleur court emphasized the father's ulterior and unlawful purpose in taking the child. Nonetheless, Lafleur is distinguishable on the ground that the father's conduct in that case violated an existing court order. Thus, we do not expressly conflict with Lafleur, although we question whether the court order in that case was sufficient to deprive Mr. LaFleur of his status as "parent" under section 787.01(1)(b).
There is no question that Mr. Muniz's behavior was inappropriate. We are inclined to believe that the State could have charged Mr. Muniz with assault on the child, see § 784.011, Fla. Stat. (1997); child abuse, see § 827.03(1)(b), Fla. Stat. (1997); contributing to the dependency of a minor, see § 827.04(1)(a), Fla. Stat. (1997); or resisting an officer, see § 843.02, Fla. Stat. (1997). Nevertheless, section 787.01(1)(b) prevents prosecution of Mr. Muniz for the first-degree felony offense of kidnaping his own child.
The legislature first created this exception to the crimes of false imprisonment and kidnaping in 1974. See ch. 74-383, Laws of Fla. Neither the holding in Badalich nor in Johnson prompted the legislature to amend these statutes to permit the state to charge a parent with kidnaping or false imprisonment of his or her child under certain circumstances. Given the complexity of modern family structure, it may be difficult for the legislature to improve upon the existing statute and to address the problems presented when a "parent" is not entitled to the custody of his or her child or when a parent confines a child for an unlawful purpose. Nevertheless, the legislature may want to consider whether the crime of kidnaping should include circumstances similar to those presented here.
We reverse the conviction for kidnaping and remand to the trial court for discharge on that count only.
NORTHCUTT and CASANUEVA, JJ., Concur.
NOTES
[1] See § 784.03(1)(a), Fla. Stat. (1997).
[2] See § 787.01(1), Fla. Stat. (1997).
[3] See ch. 75-166, Laws of Fla.; ch. 742, Fla. Stat. (1997) (entitled "Determination of Parentage"). See also § 382.013(2), Fla. Stat. (1997) (subsection of vital statistics statute entitled "Paternity" and prescribing who may be listed as father on newborn child's birth certificate).